## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | |
|---|---|
| ROBERT L. TAYLOR and ROBIN A. TAYLOR, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiff,<br><br>     v.<br><br>OCWEN LOAN SERVICING LLC, a Delaware limited liability company,<br><br>                    Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Robert L. Taylor and Robin A. Taylor bring this class action complaint on behalf of themselves and all others similarly situated to redress Defendant's flagrant and systematic disregard of the Chapter 13 bankruptcy process.  As is set forth below, Defendant is liable to Plaintiffs and others similarly situated under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*; the Fair Debt Collection Practices Act ("FDCPA"); 15 U.S.C. §§ 1692, *et. seq.*, the Illinois Consumer Fraud Act ("ICFA"), 810 Ill. Comp. Stat. § 505/1, *et. seq.*, and/or other similar statutes in effect in other states; and the common law doctrine of unjust enrichment.

### NATURE OF THE ACTION

1.      "The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor."  *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).  Defendant, however, denies Chapter 13 bankruptcy debtors a fresh start by systematically and repeatedly ignoring court orders related to the successful completion of Chapter 13 plans.

This action seeks to redress the fraudulent practices committed by Ocwen Loan Servicing LLC., ("Ocwen" or "Defendant") in connection with its home mortgage loan servicing businesses.

2.     Chapter 13 bankruptcy allows debtors to cure defaults on loans by paying arrearages through the trustee pursuant to a judicially approved Chapter 13 plan.  After the debtor has successfully completed the plan, the trustee issues a "Notice of Final Cure Payment" which indicates that the debtor has cured any arrears and is no longer in default.

3.     Instead of honoring the Chapter 13 proceedings and providing borrowers with their deserved fresh start, Defendant instead continues to treat loans as in default and to seek to recover money that is not owed on the loan.

4.     Defendant's illegal behavior is facilitated by the mortgage securitization industry.

5.     Many borrowers reasonably believe the lender from whom they obtained their mortgage will hold and service their loan until it is paid off.  Instead, however, as a result of current mortgage industry practices, including the securitization and sale of mortgage backed securities, that is often not the case.  In today's market, loans and the rights to service them are bought and sold at will, sometimes multiple times.  As a result, a borrower's day-to-day relationship is typically with the mortgage servicer, like Defendant, rather than the lender who originated the loan.

6.     Mortgage servicers like Defendant do not profit directly from interest payments made by borrowers.  Rather they are largely compensated with revenue from fees assessed against the mortgage accounts they service.  According to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [who owns the loan]

2

money, but [it] may actually earn money for the servicer in the form of fees."[1]

7.      Consistent with these motivations, Defendant systematically fails to acknowledge the legal import  of Chapter 13 bankruptcy proceedings. Even after the successful completion of a Chapter 13 plan, Defendant continues to treat loans as in default or with inflated balances that fail to acknowledge the cure of arrearages, diverting mortgage payments to pay illegitimate arrearages, fees, and costs that were cured in the bankruptcy.

8.      Bankruptcy judges have chastised Ocwen for its behavior and disregard of the bankruptcy process.  *See, e.g., In re McKain*, No. 08-10411, 2009 WL 2848988, at *5 (Bankr. E.D. La. May 1, 2009) ("Ocwen has repeatedly abused the claims process and failed to honor the discharge injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts.")

9.      Defendant, however, has not ceased its illegal and abusive practices, and continues to flaunt the discharge orders of United States Bankruptcy Judges.

10.     Plaintiffs brings this action seeking injunctive relief and damages on behalf of themselves and the thousands who have been denied a fresh start because of Defendant's utter disregard for the bankruptcy process.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 18 U.S.C. § 1965(a) (RICO), 15 U.S.C. § 1692k (FDCPA), 28 U.S.C. § 1367 (supplemental jurisdiction), and 28 U.S.C. § 1332(d) (the Class Action Fairness Act) in that the

---

[1] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Nov. 19, 2015).

matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are at least 100 members of the proposed class, and at least one member of the class is a citizen of a different state than Defendant. Further, greater than two-thirds of the members of the Classes reside in states other than the states in which Defendant are citizens.

12.     This Court has general and specific personal jurisdiction over Defendant because Defendant systematically does business within this District, thereby rendering jurisdiction proper under 18 U.S.C. § 1965. Defendant engaged in unfair business practices and a racketeering enterprise directed at and/or causing injury to persons residing, located or doing business throughout the United States.

13.     Venue lies within this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

14.     Plaintiffs Robert L. Taylor and Robin A. Taylor are natural persons residing in Rock Island, Illinois.

15.     Defendant Ocwen Loan Servicing, LLC is a Delaware limited liability company, headquartered in West Palm Beach Florida, and an indirect wholly-owned subsidiary of Ocwen Financial Corporation.  Ocwen Financial Corporation is a Florida corporation and headquartered in West Palm Beach, Florida.

## OCWEN AND MORTGAGE SECURTIZATION

16.     Most residential mortgage loans are no longer held by the bank or entity that made the loan.  Instead, loans are bundled and securitized, and serviced by third parties, like Ocwen.

17.     To explain, a financial institution, known as a "Sponsor," will originate or otherwise assemble a pool of mortgage loans and sell those loans to a special purpose subsidiary,

known as a "Depositor" in order to separate the loans from the Sponsor's assets and liabilities.

18.     The Depositor then sells those loans to a single purpose vehicle ("SPV"), typically a trust.

19.     The SPV issues securities backed by the loans that are sold to the Depositor in exchange for the loans.  The Depositors, either directly through an underwriter, then sells the securities to investors, commonly hedge funds or investment houses.  These securities are known as "residential mortgage-backed securities."

20.     The SPV holds the loans and issues the securities and will then usually contract with a third-party servicer, like Ocwen, to manage the loans.

21.     While the legal title to the loans remains with the trustee for the SPV, it is servicers like Ocwen who are the entities that typically exercise the rights attendant to title in the name of the trustee.

22.     Servicers like Ocwen, however, are not paid based on the interest earned on the loans.

23.     Rather than earn income from the interest on these loans, the SPVs pay Ocwen fees for their loan administration services. These fees are generally fixed fees that are based on a percentage of the outstanding balance of the loan portfolio.  Thus, Ocwen has an incentive to overstate the outstanding balance of any loan.

24.     Ocwen also earns income through the imposition of fees. Under agreements with SPVs, (known as pooling and service agreements), Ocwen assesses fees on borrowers' accounts, such as late fees and default-related fees, like property inspections.

25.     Defendant gets paid for any unreimbursed default related fees off the top, meaning that the SPV pays the servicer for the fees before it pays the investors. Any default fees not

ultimately recovered from the borrower functionally come out of the pocket of the investors in the securities.

26.     Thus, Ocwen actually has an "incentive to push loans into foreclosure" and to keep loans in a state of default.[2]

27.     As one Member of the Board of Governors of the Federal Reserve System has explained, "[w]hile an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best. The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor. . . . The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse."[3]

28.     Ocwen has nearly free rein in imposing costs on borrowers because the investors and the trustees of the SPVs are in poor positions to monitor any misbehavior by it.  Investors have no direct dealings with the servicers and do not have access to servicer expense reports.

29.     Seeking to capitalize on these circumstances, Ocwen has positioned itself as a major player in the residential mortgage servicing industry.  As larger banks have shifted their attention to servicing the mortgage loans of their core customers – *i.e.*, prime loan borrowers that use the banks' other services – Ocwen focused on servicing loans obtained by non-prime, or

---

[2] Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior, https://www.nclc.org/images/pdf/pr-reports/report-servicers-modify.pdf.

[3] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, *Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference*, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm (last visited Nov. 19 2015).

credit impaired, borrowers.[4]

30.     Part of Ocwen's growth strategy has been to automate many of its processes, such as through software programs designed to manage accounts and assess fees, according to protocols and policies designed by the executives at Ocwen. Ocwen assigns the task of administering the millions of loans serviced by it to computer software programs.  These programs, however, are unable to properly handle loans that have gone through the bankruptcy process and whether as a result of this inability or other failures at Ocwen to adhere to the legal requirements of complying with loan servicing of mortgages through the bankruptcy process, Ocwen has systematically, as set forth immediately below, disregarded the Chapter 13 bankruptcy process.

31.     Ocwen has grown at a tremendous rate, increasing its residential servicing portfolio from 351,595 residential loans with an aggregate unpaid principal balance ("UPB") of $50.0 billion at December 31, 2009, to 2,861,918 residential loans with an aggregate UPB of $464.7 billion at December 31, 2013.

### OCWEN'S DISREGARD OF THE CHAPTER 13 BANKRUPTCY PROCESS

32.     A Chapter 13 bankruptcy allows individuals to repay their debts over a specified period of time pursuant to a repayment plan.

33.     As explained by the Administrative Office of the U.S. Courts, "Chapter 13 offers individuals a number of advantages over liquidation under chapter 7. Perhaps most significantly, chapter 13 offers individuals an opportunity to save their homes from foreclosure. By filing under

---

[4] "Ocwen currently services more than $400 billion of customer-care intensive, high risk single-family residential loans, including securitized residential loan servicing (GSE, subprime, ALT A, and second liens)."  *See*  http://www.ocwen.com/residential-servicing-why-choose-ocwen  (last visited Nov. 18, 2015).

this chapter, individuals can stop foreclosure proceedings and may cure delinquent mortgage payments over time."[5]

34.     After filing for bankruptcy, the Chapter 13 debtor must file a repayment plan that is approved by the court that allows for fixed payments to the bankruptcy trustee.

35.     With respect to claims secured by the debtor's principal residence, if the debtor successfully makes all the payments pursuant to the Chapter 13 plan, the trustee will file and serve a Notice of Final Cure Payment which states that the debtor has paid in full the amount required to cure any default on the claim.  Bankr. R. 3002.1(f).

36.     Within 21 days of the service of Notice of Final Cure payment, the holder has 21 days to file a statement indicating "whether it agrees that the debtor has paid in full the amount required to cure the default on the claim."  Bankr. Rule 3002.1(g).

37.     This rule is designed to ensure that the "debtor and the trustee [are] informed of the exact amount needed to cure any prepetition arrearage . . . and the amount of postpetition obligations."  Bank. R. 3002.1 adv. comm. nn. (2011).  As noted by one court: "A lender's failure to comply with the Rule has the potential to not only mislead or injure parties but also to interfere with bankruptcy procedure and the administration of justice."  *Sokoloski v. PNC Mortgage*, No. CIV. 2:14-1374 WBS, 2014 WL 6473810, at *6 n.2 (E.D. Cal. Nov. 18, 2014).

38.     Ocwen, however, disregards these rules, fails to respond to Notices of Final Cures, and continues to insist that debtors owe amounts that were cured during the bankruptcy.

39.     Ocwen has been chastised for repeated disregard of bankruptcy orders.  In 2009, after cataloguing Ocwen's repeated failure to honor the bankruptcy process, Judge Elizabeth

---

[5]     Chapter 13 – Bankruptcy Basics, http://www.uscourts.gov/services-forms/bankruptcy/bankruptcy-basics/chapter-13-bankruptcy-basics (last visited May 9, 2015).

Wagner of the Eastern District of Louisiana wrote:

> Ocwen has repeatedly abused the claims process and failed to honor the discharge injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts. The Court finds that this practice is in bad faith and requires greater regulation of Ocwen's behavior to curtail further abuse of the bankruptcy system. The record reflects that this is an ongoing pattern that imposes a burden on debtors and the Court to monitor Ocwen's claims and pleadings. The Court has repeatedly struck improper charges and has issued monetary sanctions against Ocwen. Ocwen's continuing disregard for bankruptcy law and procedure is a clear indication that monetary sanctions are simply ineffective.

*In re McKain*, No. 08-10411, 2009 WL 2848988, at *5 (Bankr. E.D. La. May 1, 2009). *See also In re Batiste*, No. 03-10398, 2009 WL 2849077, at *6 (Bankr. E.D. La. July 14, 2009) ("Ocwen has repeatedly abused the claims process and failed to honor the discharge injunction by attempting to collect from debtors and their bankruptcy estate disallowed or undisclosed debts immediately following discharge. The Court finds that this practice is in bad faith and requires greater regulation of Ocwen's behavior to curtail further abuse of the bankruptcy system.")

40.     In holding Ocwen in contempt, Judge Stephani W. Humrickhouse described Ocwen's "cavalier attitude" toward court proceedings:

> Ocwen's cavalier attitude toward the discharge injunction, the terms of an order of this court, and the effect of its actions on the debtors is wholly unacceptable. The fact that Ocwen is unwilling to acknowledge the seriousness of this matter even today carries significant weight with the court. As the court informed the parties at the conclusion of the show cause hearing, sanctions are warranted in this matter. It is obvious that only significant monetary sanctions will get Ocwen's attention.

*In re Adams*, No. 04-003875-5-SWH, 2010 WL 2721205, at *5 (Bankr. E.D.N.C. July 7, 2010).

41.     Defendant's failure to abide by bankruptcy court decisions has repeatedly been alleged to continue. *See, e.g., Best v. Ocwen Loan Servicing, LLC,* No. 15-cv-13007, 2016 WL 125875 (E.D. Mich. 2016); *In re Stambaugh*, 531 B.R. 191 (Bankr. S.D. Ohio 2015); *In re Alley,* No. 09-21500, 2014 WL 2987656 (Bankr. D. Me. July 1, 2014); *In re Green,* No. 12-13410, 2014

WL 1089843 (N.D. Ohio Mar. 19, 2014)*In re Englert,* 495 B.R. 266 (Bankr. E.D. Pa. 2013); *In re*

*Schafer,* No. 07–61297–13, 2013 WL 1197612 (Bankr. D. Mont. Mar. 25, 2013).

42.     Despite being publicly called out for its abuse of the bankruptcy process, Ocwen,

however, has steadfastly refused to fix its computer software programs and its servicing practices

and continues to defraud consumers who have availed themselves of the protections provided by

the bankruptcy code.

### ALLEGATIONS SPECIFIC TO NAMED PLAINTIFFS

43.     On or about December 15, 2000, Plaintiffs entered into a mortgage agreement with

Pinnfund USA.

44.     On or about January 1, 2007, Plaintiffs fell behind on their mortgage payments.

45.     On May 16, 2008, foreclosure proceedings were initiated against Plaintiffs

Fourteenth Judicial District, Rock Island County Illinois, case number 2008 Ch 226.

46.     On January 19, 2009, to save their home, Plaintiffs filed for Chapter 13

bankruptcy, Case No. 09-80141 (Bankr. C.D. Ill.).

47.     At the inception of the bankruptcy, Plaintiffs' mortgage was serviced by Saxon

Mortgage Services.

48.     Plaintiffs' amended Chapter 13 plan was confirmed by the bankruptcy court on

July 23, 2009.  The arrears to be paid on the mortgage was found to be $15,819.50.

49.     Plaintiffs successfully made their Chapter 13 payments to cure their arrears.

50.     During the course of the bankruptcy, on March 14, 2012, Saxon filed a notice of

transfer of servicing rights to Ocwen.  Ocwen thus acquired the servicing rights to Plaintiffs'

mortgage while the loan was in default.

51.     On March 10, 2014, the Trustee pursuant to Bankruptcy Rule 3002.1(f) filed a

Notice of Final Cure Payment and served it on Ocwen.  Ocwen never filed a response.

52.     Plaintiffs were granted a discharge on March 25, 2014.

53.     On June 4, 2014, the bankruptcy court ordered ("Order on Final Cure") that Plaintiffs mortgage was deemed current as June 3, 2014, and that Ocwen had waived any right to claim any additional payments or charges due from the Plaintiffs.

54.     At the completion of their bankruptcy, Plaintiffs owed $52,729.05 on their loan.

55.     Shortly after the bankruptcy ended, Ocwen dismissed the long-standing foreclosure suit.

56.     In or around July 2014, Plaintiffs requested that Ocwen provide Plaintiffs with a pay-off quote.

57.      On July 10, 2014, via U.S. Mail, Ocwen sent Plaintiffs a "Payoff Quote" that stated that Plaintiff owed $84,447.58 on their mortgage, including $28,391.00 in interest that had accrued during the bankruptcy, $2,248.85 for "Fee/Cost Adjustment," and $738.35 in "Late Charges."  This was a materially false statement and an attempt to obtain monies from Plaintiffs that they did not owe as a result of the Notice of Final Cure Payment and Order on Final Cure.

58.     Ocwen knew the charges were unlawful because it had received the Notice of Final Cure Payment and the Order on Final Cure.  Further, Ocwen dismissed the foreclosure action, which demonstrated that Ocwen was aware that the mortgage was current.

59.     In reliance on Ocwen's fraudulent misrepresentations, Plaintiffs entered into a loan modification agreement in September 2014 that increased the principal balance on Plaintiffs' loan to $82,112.07 – i.e., approximately $30,000 more than Plaintiffs actually owed.  By increasing the principal balance of the loan, Ocwen unjustly increased its compensation in servicing the loan.

60.     Plaintiffs have made mortgage payments based on the fraudulently inflated

balance.

61.     Ocwen has also been misreporting the status of Plaintiffs' loan on Plaintiffs' credit reports.  The amounts owed on the mortgage that Ocwen has reported to credit reporting agencies, including to TransUnion regarding Plaintiff Robin Taylor, are inaccurate and do not account for the outcome of the bankruptcy proceedings.

62.     By disregarding the bankruptcy proceedings and through its illegal, deceptive, and fraudulent acts, Ocwen has enriched itself at the expense of Plaintiffs and denied them the fresh start that Plaintiffs earned by successfully completing Chapter 13 bankruptcy.

63.     Ocwen's actions violated RICO, the FDCPA, the ICFA and the Illinois common law of unjust enrichment.

## CLASS ACTION ALLEGATIONS

64.     Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

65.     The classes Plaintiffs seek to represent are defined as follows:

**RICO Class**

All United States residents who within the applicable limitations period had a loan serviced by Ocwen and (1) made payments on their mortgage loan pursuant to a Chapter 13 plan; (2) were issued a Notice of Final Cure Payment or similar document to which Ocwen did not object; (3) for whom Ocwen did not acknowledge the mortgage as current after the Notice of Final Cure payment was issued; and (4) to whom, after the Notice of Final Cure payment or similar court ruling was issued, Ocwen, in disregard of the notice of cure or similar court ruling, sent mortgage statements through the mail or electronically or about whom Ocwen furnished information to credit reporting agencies reflecting that the loan was not current.

**FDCPA Class**

All United States residents who within the applicable limitations period.

had a loan serviced by Ocwen and (1) made payments on their mortgage loan pursuant to a Chapter 13 plan (2) were issued a Notice of Final Cure or similar document to which Ocwen did not object (3) for whom Ocwen did not acknowledge the mortgage as current after the Notice of Final Cure payment was issued (4) to whom, after the Notice of Final Cure payment or similar court ruling was issued, Ocwen, in disregard of the notice of cure or similar court ruling, sent mortgage statements through the mail or electronically or about whom Ocwen furnished information to credit reporting agencies reflecting that the loan was not current and (5) for whom Ocwen acquired the servicing rights to the loan when according to Ocwen's records, the loan was in default.

**Illinois Class**

All Illinois residents who within the applicable limitations period had a loan serviced by Ocwen and (1) made payments on their mortgage loan pursuant to a Chapter 13 plan (2) were issued a Notice of Final Cure or similar document to which Ocwen did not object (3) for whom Ocwen did not acknowledge the mortgage as current after the Notice of Final Cure payment was issued and (4) to whom, after the Notice of Final Cure payment or similar court ruling was issued, Ocwen, in disregard of the notice of cure or similar court ruling, sent mortgage statements through the mail or electronically or about whom Ocwen furnished information to credit reporting agencies reflecting that the loan was not current.

66.     Ocwen services thousands of mortgages that have been through Chapter 13 bankruptcy proceedings.  Therefore, the proposed Classes are so numerous that joinder of all members is impracticable.

67.     All members of the Classes have been subject to and affected by the same practices and policies described herein.  There are questions of law and fact that are common to the Class and which predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to the following:

      a.     Whether Defendant had a policy or practice of disregarding the Notice of Final Cure payment or similar court rulings received by borrowers whose loans it serviced;

      b.     Whether Defendant has engaged in mail and wire fraud;

13

c.      Whether Defendant engaged in a pattern of racketeering activity;

d.      Whether Defendant conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

e.      Whether Defendant's practices were unfair or deceptive practices;

f.      Whether Defendant was unjustly enriched by its unfair or deceptive practices;

g.      Whether Defendant is a debt collector under the FDCPA;

h.      Whether Defendant made false representations of the character, amount, or legal status of any debt;

i.      Whether Defendant communicated credit information which is known or which should be known to be false;

j.      Whether Defendant made false representations or utilized deceptive means to collect debts;

k.      Whether Defendant engaged in any conduct, the natural consequence of which is to harass, oppress, or abuse any person in connection with a collection of a debt

l.      Whether the Court can enter declaratory and injunctive relief; and

m.      The proper measure of damages.

68.     Plaintiffs' claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that the Plaintiffs and the other members of the Class were subject to the same wrongful policies and practices by Defendant.

69.     Plaintiffs will fairly and adequately represent the interests of the proposed Classes.

14

Plaintiffs committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions.

70.     The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

71.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes which would establish incompatible standards of conduct for the parties opposing the Classes.  Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the Plaintiff Class.

72.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because the Defendant has acted or refused to act on grounds generally applicable to the Class making final declaratory or injunctive relief appropriate.

73.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA.  Members of the Classes do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution.  Class certification also will obviate the need for

unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

74.     A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

>   a.     Individual claims by the Class members are impractical as the costs of pursuit far exceed what any one individual Plaintiff has at stake;
>
>   b.     As a result, individual members of the Class have no interest in prosecuting and controlling separate actions;
>
>   c.     It is desirable to concentrate litigation of the claims herein in this forum;
>
>   d.     The proposed Class action is manageable.

75.     Plaintiffs are not aware of any difficulties that will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**FIRST CAUSE OF ACTION**
**Violations of the Racketeer Influenced and Corrupt Organizations Act**
**(18 U.S.C. §1962(c))**
**On Behalf of the RICO Class**

76.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-75, above, as if fully set forth herein.

77.     Plaintiffs brings this cause of action on behalf of themselves and the members of the Nationwide Class.

78.     Defendant is a "person" under 18 U.S.C. § 1961(3).

79.     Defendant violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Enterprise set forth below through a pattern of racketeering activity.

80.     Plaintiffs and Class members are "person[s] injured in his or her business or property" by reason of Defendant's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

## THE ENTERPRISE

81.     The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Enterprise:

a.      Defendant, who has taken the steps set forth above relating to the servicing of loans and the failure to abide by orders of Bankruptcy judges and failing to comply with the requirement of the Bankruptcy Code;

b.      Defendant's officers, executives, and other employees, who have collaborated and colluded with each other and with other associates in fact in the Enterprise to seek to obtain from Plaintiffs and Class members payments in excess of those owed pursuant to Notice of Final Cure payments or similar court rulings received by borrowers whose loans Defendant serviced, as well as the other acts set forth herein relating to seeking to obtain debt payments in excess of those lawfully due and in falsely reporting Chapter 13 debtors' loan balances and delinquencies to credit reporting agencies;

c.      The unnamed SPVs, sponsors and depositors of the loans at issue in this case who contracted with Defendant to service those loans and who have benefitted from the acts set forth herein.

82.     The Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common

purpose. The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

83.     While the Defendant participated in the conduct of the Enterprise, it had an existence separate and distinct from the Enterprise as a whole. Further, the Enterprise was separate and distinct from the pattern of racketeering in which the Defendant has engaged.

84.     At all relevant times, the Defendant operated, controlled or managed the Enterprise, through a variety of actions. The Defendant's participation in the Enterprise was necessary for the successful operation of its scheme to defraud because, as servicer, the Defendant controlled communications with the Plaintiffs and Class Members.

85.     The members of the Enterprise all served a common purpose: to profit from asserting amounts due on mortgage loans in excess of those subject to Notices of Final Cure Payment and Orders on Final Cure.  To achieve the common purpose, participants in the Enterprise preserve close business relationships and maintain established and defined roles within the Enterprise.

86.     The relationship between Defendant and the unnamed SPVs, Sponsors, and Depositors has been in existence for many years, is still ongoing, and has longevity sufficient to permit participants to achieve their common purposes.

87.     The Enterprise is engaged in and its activities affect interstate commerce.  The Enterprise securitizes and services millions of loans throughout the country.

88.     Defendant, acting through the Enterprise, has implemented policies and taken actions in furtherance of its scheme to defraud borrowers including:

- intentionally refusing to implement procedures so that Ocwen properly accounts for Chapter 13 bankruptcy proceedings, including failing to abide by orders of

Bankruptcy judges and failing to comply with the requirement of the Bankruptcy Code;

- sending former Chapter 13 debtors deceptive and misleading information about the balances owed on their loans, including but not limited to inaccurate payoff statements;

- reporting false information regarding former Chapter 13 debtors' loan balances and delinquencies to credit reporting agencies.

89.     By developing and implementing policies and procedures leading to the repeated, and unlawful overcharging of successful Chapter 13 debtors, Defendant has used its role in the Enterprise to enrich itself unlawfully at the expense of former Chapter 13 debtors, and engaged in the conduct of the Enterprise distinct from own affairs as a loan servicer and contrary to the servicing guidelines under which it is obligated to operate.

## THE PREDICATE ACTS

90.     Defendant's systematic scheme to defraud successful Chapter 13 borrowers who have mortgage loans serviced by Ocwen was facilitated by the use of the United States mail and wire.  Ocwen's activities constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) as acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

91.     In violation of 18 U.S.C. §§ 1341 and 1343, Ocwen utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Ocwen by obtaining money from borrowers using false or fraudulent pretenses.

92.     Through the mail, including the communication set forth in paragraph 75, to the Plaintiffs, Defendant provided mortgage invoices, loan statements, and payoff statements, that misrepresented the status of the mortgage loan and did not accurately account for the Chapter 13

bankruptcy proceedings. Defendant also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail. Each of these acts constituted an act of mail fraud for purposes of 18 U.S.C. § 1341.

93.    Through the wire and the mail Ocwen provided mortgage invoices, loan statements, and payoff statements that misrepresented the status of the mortgage and did not accurately account for the Chapter 13 bankruptcy proceedings.  Ocwen also accepted payments and engaged in other correspondence in furtherance of their scheme through the wire.  Each of these acts constituted an act of mail and wire fraud for purposes of 18 U.S.C. § 1343.

94.    Further, through wire transmissions, Ocwen has electronically repeatedly reported false information to credit reporting agencies regarding the status of borrowers' loans that do not reflect Chapter 13 bankruptcy proceedings.  These false statements to credit reporting agencies were part of Ocwen's fraudulent scheme to extract unlawful funds from successful Chapter 13 borrowers.  Each of these acts constituted an act of wire fraud for purposes of 18 U.S.C. § 1343.

95.    Ocwen knowingly and intentionally committed these instances of mail and wire fraud in furtherance of its scheme to defraud successful Chapter 13 debtors.

96.    The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which Ocwen have engaged under 18 U.S.C. § 1962(c).

97.    The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

98.    Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

99.    As a direct and proximate result of these violations of 18 U.S.C. § 1962(c),

Plaintiffs and members of the Nationwide Class have suffered substantial damages and injury to their property.  Defendant is liable to Plaintiff and members of the Class for treble damages and appropriate injunctive relief together with all costs of this action, plus reasonable attorney's fees, as provided under 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of the FDCPA**
**(15 U.S.C. §1692, et seq.)**
**On Behalf of FDCPA Class**

100.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-75, above, as if fully set forth herein.

101.    Plaintiffs and members of the FDCPA Class are consumers within the meaning of 15 U.S.C. §1692(a) as they are "natural persons obligated or allegedly obligated to a pay any debt."

102.    Defendant is a debt collector within the meaning of 15 U.S.C. §1692(a)(6) as it acquired the servicing rights Plaintiffs and FDCPA Class members loans while according to Ocwen's records, those loans were in default.

103.    By sending false payoff statements and other statements that did not accurately account for the borrowers' Chapter 13 proceeding, charging and collecting fees, costs, and interest not authorized by law or contract, and by furnishing such false information to credit reporting agencies, Defendants violated the FDCPA, specifically the FDCPA's prohibitions on:

- "Engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. §1692(d)

- Making "false representation[s] of the character, amount, or legal status of any debt."  15 U.S.C. §1692(e)(1)

- "Communicating . . . to any person credit information which is known or which should be known to be false."  15 U.S.C. §1692(e)(8).

- "Us[ing] any false representation or deceptive means to collect or attempt to collect any debt."  15 U.S.C. §1692e(10).

- Collecting interest, fees, charges, and expenses not "expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1).

104.    As a direct and proximate result of Defendant's violations of the FDCPA, Plaintiffs and members of the FDCPA Class have suffered actual damages.

105.    Defendant is liable to Plaintiff and members of the Class for actual damages and statutory damages, appropriate declaratory and injunctive relief together with all costs of this action, plus reasonable attorney's fees.  15 U.S.C. § 1692k.

## THIRD CAUSE OF ACTION
### Violation of the Illinois Consumer Fraud Act (ICFA)
### 810 Ill. Comp. Stat. § 505/1, et. seq.
### On Behalf of the Illinois Class

106.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-75, above, as if fully set forth herein.

107.    Defendant violated 815 Ill. Comp. Stat. § 505/2 by engaging in unfair and deceptive acts or practices in the conduct of trade or commerce.

108.    Defendant's conduct in relation to Plaintiffs' and Illinois Class members' loans were willful, malicious, unfair, and designed to enrich Defendant at the expense of Plaintiffs' and Class members.

109.    Defendant's conduct offends public policy because it is contrary to orders of the bankruptcy court, contrary to the purposes of Chapter 13 bankruptcy proceedings, and is designed to deceive successful Chapter 13 debtors into paying more than what is owed.

22

110.    By ignoring bankruptcy court orders and procedures, Defendant's conduct harms the orderly administration of justice.

111.    Defendant's action are immoral because its actions caused an undue hardship to Plaintiffs' and Class members and an undue profit for Defendant.

112.    Defendant's conduct was deceptive.  Defendant consistently mispresented the status of Plaintiffs' and Class members' loans, overcharged Plaintiffs' and Class members, and employed communications that were confusing so that Plaintiffs' and Class members could not decipher the true statues of their loans.

113.    Defendant repeatedly mispresented the status of Plaintiffs' and Class members' loans.

114.    As a result of Defendant's unfair and deceptive conduct, Plaintiffs' and Illinois Class members suffered substantial damages.

115.    Defendant is liable to Plaintiffs and members of the Illinois Class for actual damages, punitive damages, appropriate injunctive relief together with all costs of this action, plus reasonable attorney's fees as provided for in 815 Ill. Comp. Stat. § 505/10(a).

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**Illinois Class**

116.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1-75, above, as if fully set forth herein.

117.    Plaintiff bring this cause of action on behalf of herself and the members of the Illinois class.

118.    Through their deceptive and fraudulent acts and flagrant disregard of court orders and the bankruptcy process, Defendant was unjustly enriched to the detriment of Plaintiff and

members of the Class.

119.    Defendant's retention of the monies received from Plaintiffs and Class members to which it was not entitled, including additional principal and interest amounts and other fees, s violated the fundamental principles of justice, equity, and good conscience.

120.    Plaintiffs and members of the Class seek restitution from Defendant, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant from their wrongful conduct.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

1.      Certifying the Classes, as requested herein, appointing Plaintiffs as the representative of the Classes, and appointing Plaintiff's counsel as counsel for the Classes;

2.      Issuing appropriate notice to the Classes at Defendant's expense;

3.      Awarding Plaintiffs and the members of the Classes compensatory and statutorily enhanced damages or compensation as provided for under law for each of the causes of action set forth above;

4.      Awarding restitution and disgorgement of Defendant's revenues or profits from its illegal behavior described herein to Plaintiffs and members of the Classes;

5.      Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and to disgorge to them all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful or pay them restitution; change its accounting and servicing practices; and audit and

correct the accounts of every Class member.

6.    Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

7.    Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

8.    For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

DATED:  August 16, 2016

Respectfully,

DEUTSCH & DEUTSCH

By:    _____
Joel A. Deutsch #00623059
1825 3rd Avenue
Rock Island, IL 62101
Telephone: 309-788-9541

KLAFTER OLSEN & LESSER, LLP

By:    _____
Seth R. Lesser
Two International Drive, Suite 350
Rye Brook, NY  10573
(914) 934-9200

Todd S. Collins*
E. Michelle Drake*
Eric Lechtzin*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000

25

Stuart Rossman*
Charles Delbaum*
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th Floor
Boston, MA  02110
(617) 542-8010

* to be admitted *pro hac vice*