UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| ROBERT L. TAYLOR and ROBIN A. TAYLOR, on behalf of themselves and all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>OCWEN LOAN SERVICING, LLC, a Delaware limited liability company,<br><br>　　　　Defendant. | Case No. 4:16-cv-04167-SLD-JEH |

## ORDER

Before the Court are Defendant's motion to dismiss the amended complaint for failure to state a claim, ECF No. 11, and its motion for leave to reply to Plaintiffs' response, ECF No. 19. For the following reasons, the motion to dismiss is GRANTED, and the motion for leave to reply is DENIED.

## BACKGROUND[1]

On December 15, 2000, Plaintiffs Robert and Robin Taylor obtained a loan from a company called Pinnfund USA, and mortgaged their home as collateral. They fell behind on payments on this loan on January 1, 2007, and on May 16, 2008, foreclosure proceedings began in Illinois court. The Taylors filed for Chapter 13 bankruptcy on January 19, 2009 in the Central District of Illinois. (Chapter 13, 11 U.S.C. §§ 1301–1330, permits certain debtors entering bankruptcy to restructure their debt and stop foreclosure proceedings against their home. 11

---

[1] In a motion to dismiss, all well-pleaded allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (citation omitted). Accordingly, the material set forth here is, unless otherwise noted, based on allegations in the amended complaint, ECF No. 9.

U.S.C. § 1322(c)(1).)  When the bankruptcy proceedings began, the Taylors' loan was being serviced by Saxon Mortgage Services ("Saxon").

The bankruptcy court approved the Taylors' Chapter 13 plan on July 23, 2009, and determined that the Taylors' mortgage was in arrears in the amount of $15,819.50.  Over the following years, the Taylors made payments against this amount.  On March 14, 2012, while the Chapter 13 proceedings continued, Saxon sold the servicing rights on the Taylors' loan to Defendant Ocwen Loan Servicing, LLC ("Ocwen").  On March 10, 2014, the bankruptcy trustee filed a notice of final cure payment and served it on Ocwen, which did not file a response.  The Taylors received a discharge from bankruptcy on March 25, 2014.  The bankruptcy court issued an order and final cure declaring that the Taylors' mortgage was no longer in arrears as of June 3, 2014, and that Ocwen did not have the right to claim additional payments or charges on it.  At this point, the Taylors still owed $52,729.05 on the loan.  Soon after the bankruptcy proceedings concluded, Ocwen dismissed the foreclosure suit, which had remained pending during the bankruptcy proceedings.

In July 2014, the Taylors asked Ocwen "to inform them of their current mortgage payment and balance on the loan."  Am. Compl. ¶ 62.  On July 8, 2014, Ocwen informed the Taylors by mail that they would have to pay $50,885.18 to "reinstate" their loan, and, apparently[2] in addition, that they would have to pay $27,449.08 in interest, a $765.39 late charge, and a $2,248.48 "Fee/Cost Adjustment. *Id.* ¶ 63.  On July 10, 2014, Ocwen mailed the Taylors a document stating that they owed $84,447.58 on the mortgage, including the $52,729.05 in principal, $28,391 in interest that had accrued during bankruptcy, a "Fee/Cost Adjustment" of

---

[2] It is not clear from the language the Taylors use in the amended complaint whether they mean that the first letter from Ocwen told them that the interest, late charge, and "fee adjustment" were in addition to the $50,885.18, or part of it.  It is immaterial at this point, however, because it is plain that the Taylors allege the first letter to have contained materially false statements that induced them to sign the loan modification agreement discussed below.

$2,248.85, a $422.28 "Escrow Advance," and $738.35 in late fees. *Id.* ¶ 64. And on July 17, 2014, Ocwen sent the Taylors another document, asserting that they owed $84,860.29 on their mortgage, which included the previous letter's $28,391 in interest, the $2,248.85 "Fee/Cost Adjustment," $835.19 in "Escrow Advance," and $738.35 in late fees. *Id.* ¶ 65.

Although the figures in each notice were assertedly false in light of the bankruptcy court's order, and were intended to persuade the Taylors to pay money they did not actually owe, the Taylors entered into a loan modification agreement with Ocwen in September of 2014. The agreement added about $30,000 to the principal that the Taylors owed on the loan, increasing it to $82,112.07. They have been making payments on the loan ever since. Ocwen's bills to plaintiffs, and information transmitted to credit reporting agencies, has reflected this balance, rather than the lower figure the Taylors claim they actually owe.

The Taylors filed suit on August 16, 2016, ECF No. 1, and amended their complaint on November 7, 2016. They allege violations of (I) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, Am. Compl. 19–23; (II) the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p, Am. Compl. 23–24; (III) the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 810 ILCS 505/1–505/12, Am. Compl. 25–26; and also allege state law (IV) fraudulent inducement, Am. Compl. 26, and (V) unjust enrichment claims, *id.* at 26–27. The Taylors indicate that they intend to bring their suit as a class action on behalf of other similarly situated plaintiffs, Am. Compl. 14–18, but have not yet moved for class certification.

## DISCUSSION

### I. Legal Standard on a Motion to Dismiss

In reviewing a motion to dismiss, a court must accept as true all well-pleaded facts in the complaint, and draw all reasonable inferences in favor of the plaintiff. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012). A court will dismiss a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In determining whether such a claim has been stated, a court should first identify pleadings that "because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). It should then take the remaining, well-pleaded factual allegations, "assume their veracity[,] and . . . determine whether they plausibly give rise to an entitlement to relief." *Id*. This means that a complaint must provide "allegations that raise a right to relief above the speculative level." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008).

## II. Analysis

Ocwen moves to dismiss the complaint in its entirety, arguing that the Taylors have failed to allege the elements of a RICO claim, Mem. Supp. Mot. Dismiss 6–18, ECF No. 12; that the FDCPA claims are time-barred, *id.* at 18–20; and that all of the state law claims are preempted by the Bankruptcy Code, *id.* at 20–23.

### a. RICO

Ocwen argues that the Taylors do not sufficiently allege a RICO enterprise.[3]

RICO aims to punish and deter criminal conduct that co-opts otherwise-legitimate businesses for criminal purposes:

> The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken

---

[3] Ocwen makes other attacks on the sufficiency of the RICO allegations; however, since, as will appear, Ocwen is correct that an enterprise is insufficiently alleged, the Court does not address Ocwen's other arguments.

4

over.

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997).  To this end, the statute creates criminal and civil liability for people who engage in a "pattern of racketeering activity" in one of four ways:  by investing the proceeds of the pattern in an enterprise, 18 U.S.C. § 1962(a), by acquiring an interest in or control of an enterprise through the pattern, *id.* § 1962(b), by participating in the enterprise through the pattern, *id.* § 1962(c), or by conspiring to do any of those things, *id.* § 1962(d).  Racketeering activity includes any one of 35 crimes, *id.* § 1961(1), and, in order to count as a pattern, at least two such acts must be committed, *id.* § 1961(5).  Anyone injured by a violation of § 1962 may sue the violators and, if successful, receive triple damages and attorney's fees.  *Id.* § 1964(c).  The Taylors allege a violation of § 1962(c), and so "must eventually prove four elements:  (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir.), *cert. denied*, 136 S. Ct. 1607 (2016).

"[A] RICO complaint must identify the enterprise."  *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995).  An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]"  18 U.S.C. § 1961(4).  "While a RICO enterprise can be formal or informal, some type of organizational structure is required."  *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000).  "A RICO enterprise is 'an ongoing "structure" of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.'"  *Richmond*, 52 F.3d at 644 (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990)); *see Boyle v. United States*, 556 U.S. 938, 946 (2009) (stating that a RICO enterprise requires "a purpose, relationships among those

associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes."). Logically, the defendant, whether natural person or corporation, must be distinct from the other participants in the alleged enterprise. *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013).

Aside from Ocwen, the Taylors allege that the enterprise is composed of Ocwen's own "officers, executives, and other employees," Am. Compl. 19, and "unnamed SPVs, sponsors and depositors of the loans at issue in this case who contracted with Defendant to service those loans," *id.* at 20. All of these participants in the enterprise are indeed "unnamed" anywhere else in the complaint. Rather, the Taylors describe in a general fashion, under the heading "Ocwen and Mortgage Securitization," *id.* at 5, the way in which home loans are allegedly originated and sold in today's markets. The Taylors describe a process where loans secured by mortgages on homes are extended by a sponsor institution, then bundled together and sold as a security to a "special purpose subsidiary" depositor. *Id.* The depositors then sell the securitized loans to "SPVs," special purpose vehicles, typically trusts, which then sell securities backed by the loans, either back to the depositor, or directly to investors. *Id.* While all this shuffling goes on, the SPV, which owns the loans, hires a specialized company like Ocwen to service them.

These allegations fail to depict a RICO enterprise for two reasons. First, the entities alleged, and the relationships between them, do not amount to an enterprise. Second, the description is too vague.

Begin by excising Ocwen's "officers, executives, and other employees" from the allegation of enterprise. "Read literally, RICO would encompass every fraud case against a corporation . . . the corporation would be the RICO person and the corporation plus its

employees the 'enterprise.'" *Fitzgerald*, 116 F.3d at 226. But RICO aims to deter defendants from a special kind of co-option and abuse, rather than from simple fraud, and so courts have held that a corporation and its employees together cannot constitute a RICO enterprise, without more. *See id.* (collecting cases). And while the Taylors allege other participants in the RICO enterprise, naming Ocwen's personnel in addition to those other participants and Ocwen itself adds nothing. To say that Ocwen, plus its officers, executives, and employees, schemed with other corporations to defraud homeowners, without adding any detail about what particular Ocwen agents (or classes of agents) might have done, is just to repeat by synecdoche that Ocwen participated in the scheme. *See Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998) (holding that enterprise cannot be demonstrated "merely by showing that the pattern of predicate acts . . . were committed by a firm that has agents or affiliates . . . The firm must be shown to use its agents or affiliates in a way that bears at least a family resemblance to the paradigmatic RICO case in which a criminal obtains control of a legitimate (or legitimate-appearing) firm and uses the firm as the instrument of his criminality.").

Moving on to the non-redundant allegations, the distinct players in the enterprise that the Taylors *have* identified do not amount to a RICO enterprise either. Essentially, the Taylors claim that because servicing companies like Ocwen do not earn the interest on the loans, which belong to the SPVs, but are instead paid on the basis of the outstanding balance of the loan portfolio, servicing companies and Ocwen have an incentive to "overstate the outstanding balance of any loan and to increase and extend the payment period on loans [they] service[]." Am. Compl. 6. This incentive, the Taylors reason, also belongs to the SPVs that sell mortgage-backed securities and to the purchasers of the securities—although, of course, this latter group is not named as part of the enterprise.

7

But it is insufficient only to observe that Ocwen's interests as a loan servicer in some instances overlap with the owners of the loans. For one, much of the malfeasance that the Taylors allege—that is, Ocwen's supposed charging of superfluous service fees, which profit Ocwen and no one else—are not shared by the other members of the putative enterprise. And more significantly, those interests that do overlap with the owners of the loans would do so in any instance where a holder of debt hires another party to service that debt. Not every case of alleged fraud on the part of a debt servicer is a RICO enterprise by simple virtue of aligned incentives. Rather, the Seventh Circuit has explained, more detailed allegations of entanglement between enterprise members are required in order to show the coordination and purpose required under § 1962.

Two recent cases show the level of entanglement required to be alleged of a RICO enterprise. In *Bible v. United Student Aid Funds*, 799 F.3d 633 (7th Cir. 2015), the Seventh Circuit reversed the district court's grant of a motion to dismiss by defendant guaranty agency. The plaintiff alleged a RICO violation based on an enterprise involving the guaranty agency, a debt collector, and a loan service provider. *Id.* at 638. The Seventh Circuit disagreed with the district court's determination that the plaintiff had not plausibly alleged an enterprise. The appellate court distinguished between a "run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *Id.* at 655–56. Bible had successfully alleged the latter, the court explained, because she alleged a number of facts permitting the inference that all three companies worked as a single enterprise. *Id.* at 656. These facts included an "unusual degree of economic interdependence among the entities," in the form of an agreement to deal semi-exclusively between the defendant

8

and the loan servicer, and the participation of each enterprise member in the actual act of collecting on the loan. *Id.*

This intertwinement distinguished Bible's case from *United Food v. Walgreen*, 719 F.3d 849 (7th Cir. 2013). In *United Food*, the Seventh Circuit affirmed the district court's dismissal for failure to describe an enterprise in a RICO case. *Id.* at 850–51. There, the enterprise allegedly included pharmacies and drug vendors who had hatched a plan to sell more expensive drugs to the pharmacies, which would then be reimbursed by patients' insurance at a higher rate. *Id.* at 851–53. Although the plaintiff alleged that Walgreens was receptive to the vendors' sales pitch, and agreed to reprogram its pharmacy computers to sell the vendors' drugs, this did not amount to an allegation that either the vendors or Walgreen engaged in these actions as part of an enterprise:

> The complaint does not allege, for instance, that officials from either company involved themselves in the affairs of the other. . . . Nor does the complaint anywhere suggest that profits from the illegal drug-switching scheme were siphoned off to the . . . enterprise or to individual enterprise members. And although it would be possible to envision a complaint that accused individual corporate personnel of improperly hijacking the business operations of their companies for illicit ends . . . the Fund does not assert this either. Instead, the activities the complaint describes are entirely consistent with Walgreens and [the vendor] each going about its own business, with [the vendor] manufacturing generic drugs and marketing its products to pharmacies, and Walgreens purchasing drugs and filling prescriptions.

*Id.* at 854–55. In other words, shared interest was insufficient to show a RICO enterprise, without further specific factual allegations of involvement between the participants that would have made plausible the existence of structure and joint purpose. *See Richmond*, 52 F.3d at 645.

In both cases involving alleged enterprise between corporate actors, involvement of companies in each other's' affairs was the key issue. So here. The Taylors do not allege that officials from any of the (unnamed) SPVs involved themselves in Ocwen's affairs, or vice versa.

9

Unlike *Bible*, the Taylors allege no exclusivity of dealing between Ocwen and the SPVs, or indeed any other sort of collusion or attempt to carry out a joint purpose. All the Taylors allege is a sometime-coincidence of interests, and some apparently independent efforts by Ocwen to inflate the amount of an outstanding loan balance. Unlike *Bible*, there is no suggestion that anyone other than Ocwen collaborated to take these actions. And like *United Food*, the putative enterprise participants are alleged to have acted as independent corporate interests, dealing with each other at arm's length for their own separate business purposes.

The Taylors' lack of specific factual allegations is symptomatic of their claim's second major defect—its vagueness. No specific SPV is identified. Ocwen's role in the purported enterprise, beyond benefitting from inflating outstanding loan balances, is not identified. Nowhere do the Taylors suggest which entities direct and which follow, or the particular means by which fraud is planned, coordinated, and executed. What the Taylors have alleged, as Ocwen suggests, is a "run-of-the-mill commercial relationship" between Ocwen and the SPVs, Mem. Supp. Mot. Dismiss 9, and, at most, a run-of-the-mill attempt to defraud the Taylors. *See Lockhart v. HSBC Fin. Corp.*, No. 13 C 9323, 2014 WL 3811002, at *6 (N.D. Ill. Aug. 1, 2014) ("Lockhart has failed to identify with specificity the particular Defendants' roles in the organization, how the particular individuals are joined together, what orders come from the 'top' of the structure, or how the orders are relayed to the other members. To put it simply, Lockhart's complaint is lacking allegations that describe the core of an organization[.]").

The RICO enterprise element has not been sufficiently alleged, and so the RICO claim itself must be dismissed.

   **b. FDCPA**

Ocwen next argues that the statute of limitations has run on any FDCPA claim the Taylors can bring.  Mem. Supp. Mot. Dismiss 18.  In Ocwen's view, the statute must be taken to run from the dates upon which the Taylors received the allegedly fraudulent statements from Ocwen about their outstanding balance.  *Id.*  The Taylors respond that each notification they have received of the outstanding balance on their renegotiated loan is a new FDCPA violation, and that therefore, the statute of limitations has not run, at least as to those later notices.  Mem. Opp. Mot. Dismiss 10–13, ECF No. 18.

The FDCPA prohibits the false representation of the character, amount, or legal status of any debt.  15 U.S.C. § 1692e(2)(A).  It also prohibits communication to a third party of false credit information, or information that should have been known to be false, *id.* § 1692e(8); and collection of debt amounts not authorized by agreement or permitted by law, *id.* § 1692f(1).  The statute of limitations for FDCPA claims is one year.  15 U.S.C. § 1692k(d).  Ordinarily, courts do not consider affirmative defenses, like the operation of a statute of limitations, on a motion to dismiss, because "a plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses."  *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012).  However, "when a plaintiff's complaint nonetheless sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate."  *Id.*

The three 2014 account statements described in the amended complaint are outside the statute of limitations.  If a series of similar or related injuries are inflicted on a plaintiff over a period of time, "[t]he statute of limitations begins to run upon injury (or, as is standardly the case with federal claims, upon discovery of the injury) and is not tolled by subsequent injuries." *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008).  Each injury has its own statute of limitations; thus, if a series of injuries occurs over ten years, the statute of

limitations is five years, and the injured party sues in the fifteenth year, he will be able to bring suit only for the last year's injury. *Id.* The Taylors' complaint alleges that the "false payoff statements and other statements that did not accurately account for the borrowers' Chapter 13 proceeding, charging and collecting fees, costs, and interest not authorized by law or contract, and . . . furnishing false information to credit reporting agencies" were all FDCPA violations. Am. Compl. 24. But the payoff statements came in July 2014, so it is too late to sue for the injury they caused, as the Taylors concede. *See* Mem. Opp. Mot. Dismiss 10–11 ("Plaintiffs' Fair Debt claims are based solely on the separate misrepresentations made within a year of the filing of this action."). Their claims, then, can rest only on the theory that a new FDCPA violation was committed each time Ocwen mailed statements describing ongoing payments the Taylors were making on a loan alleged to have been fraudulently induced, and each time it transmitted credit information reflecting the loan's existence. *Id.*

The Taylors cite other cases where courts have held that repeated notices of outstanding debt, or attempts to collect on it, are discrete injuries from which the statute of limitation can independently run. *See Michalak v. LVNV Funding, LLC*, 604 F. App'x 492, 494 (6th Cir. 2015) (holding that when multiple inconsistent and inaccurate dunning letters were alleged to have been sent, but one fell outside the statute of limitations, plaintiff was able to bring the other claims timely because each was an FDCPA violation); *Solomon v. HSBC Mortg. Corp.*, 395 F. App'x 494, 498 (10th Cir. 2010) (holding that alleged notices of outstanding debt and foreclosure proceedings qualified as independent FDCPA violations); *Purnell v. Arrow Fin. Servs., LLC*, No. 07-1903, 303 F. App'x 297, 303, 2008 WL 5235827 (6th Cir. 2008) ("To the extent that these violations are alleged to have occurred outside the limitations period, they are barred by the statute of limitations. But, to the extent that plaintiff can prove that such violations

occurred within the limitations period, they are not time-barred."). But the Taylors beg the question by assuming, without argument, that the particular communications described here, sent within a year of the Taylors' lawsuit, can have independently violated the FDCPA. They cannot.

In the cases the Taylors cite, the allegedly illegal communications were attempts to collect on disputed debts. Here, the Taylors claim not that Ocwen tried to collect on a debt it knew or should have known to be invalid, but that Ocwen sent them and credit reporting agencies accurate descriptions of a debt they had contracted for with Ocwen. Recall that the Taylors claim they were fraudulently induced to sign the loan modification agreement, not that the agreement itself did not exist, or that Ocwen's subsequent descriptions were untruthful depictions of this agreement. *See Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 779 (7th Cir. 2002) ("'Fraud in the inducement' occurs when fraud induces a party to assent to a commitment that the party understands but to which the party would not otherwise have assented; the promisor knows what it is signing but its assent is induced by fraud."). The Taylors, of course, want this distinction to make no difference. Mem. Opp. Mot. Dismiss 13–14. But the loan modification agreement does matter: it cabins potential violations of the FDCPA to debt communications that preceded it.

To see why, look at the various kinds of violation of the FDCPA that the Taylors allege. The Taylors claim that Ocwen's communications about their debt had "the natural consequence . . . to harass, oppress, or abuse [them] in connection with the collection of a debt," 15 U.S.C. § 1692d; that the notices to them were "false representation[s] of the character, amount, or legal status" of the debt, *id.* § 1692e(2); that messages to creditors were "information which is known or which should be known to be false," *id.* § 1692e(8); that the notices written to them were "false representation[s] or deceptive means to collect or attempt to collect" on a debt, *id.*

13

§ 1692e(10); and that Ocwen collected interest, fees, charges, and expenses not "expressly authorized by the agreement creating the debt or permitted by law," *id.* § 1692f(1).  Mem. Opp. Mot. Dismiss 24.  But all that the notices sent to the Taylors are alleged to have done was state the outstanding balance on the loan the Taylors had been induced to take out.  These letters were not "harassing" in any conceivable sense, 15 U.S.C. § 1692d, nor did they contain false information, *id.* § 1692e(8).  They did not seek to deceive the Taylors into paying, *id.* § 1692e(10), because, in the Taylors' version of events, the deception had already been accomplished.

This leaves only theory that the letters and notices to credit agencies were false representations of the "legal status" of the debt, *id.* § 1692e(2), and acceptance of payments not "permitted by law," *id.* § 1692f(1).  In the ordinary sense of the term, the "legal status" of the debt, as Ocwen issued statements about it, was that the Taylors had agreed to pay it.  In the ordinary sense of the term, the receipt of the payments, which the Taylors voluntarily made, was "permitted by law."  Only on the very broadest notion of legality can a fraudulent conveyance render contrary to law all later statements referring to the conveyance, or acting on it.  An allegation of fraudulent inducement does not poison all later communications about a debt so successfully that each and every communication over the debt constitutes a new FDCPA violation, even as plaintiffs are steadily paying that debt down on the terms contained in the notices—although the Taylors find themselves forced to assert as much.

> When a statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of its being applied to situations absurdly remote from the concerns of the statute's framers. Courts find it helpful, in interpreting such statutes in a way that will avoid absurd applications . . . first to identify the prototype situation to which the statute is addressed.

14

*Fitzgerald*, 116 F.3d at 226–27.  As in *Michalak*, *Solomon*, and *Purnell*, the prototypical FDCPA claim involves a creditor who receives a false or misleading statement about unlawful or nonexistent debt.  The Taylors offer no case law suggesting that the statute should be so dramatically extended as to include any communication made concerning a loan agreement a plaintiff claims he was tricked into making.

Because none of the communications that can form the basis of a timely FDCPA claim could be shown to violate the statute, the FDCPA claim must be dismissed.

### c.   Remaining State Law Claims

Ocwen argues that the ICFA, fraudulent inducement, and unjust enrichment claims are all preempted by the Bankruptcy Code.  However, the Court declines to reach this argument.  All the remaining claims fall under Illinois law.  Without a federal law claim remaining, the Court declines to exercise supplemental jurisdiction over them.  *See* 28 U.S.C. § 1367(c)(3); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500–01 (7th Cir. 1999).

## CONCLUSION

Accordingly, Defendant's motion to dismiss, ECF No. 11, is GRANTED, and its motion for leave to file a reply, ECF No. 19, DENIED.  The amended complaint, ECF No. 9, is DISMISSED.  The Clerk is directed to enter judgment and close the case.

Entered this 10th day of August, 2017.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
